No. 66.—William H. Malone *alias* William H. Hall, plaintiff in error, *vs.* The State of Georgia, defendant.

[1.] The Act of 1805 changes the Act of 1799, only as to the mode of select- ing *Grand* Jurors. Under both Acts, those remaining on the list, as made out from the tax books by the Clerk, constitute the *Petit* Jury, for the trial of civil and criminal causes, so that the Act of 1799 is, in fact, superseded, both as to Grand and Petit Jurors, by the Act of 1805.

[2.] Where a Juror has answered negatively both of the questions propound- ed by the Act of 1803, and been found competent by triors, who were not specially sworn for that purpose, and been accepted by the prisoner and sworn in chief, and the Court, to cure the irregularity, causes the Juror to be put again upon the prisoner, who objected on the ground that he had already been sworn in chief, and was thereby understood by the presiding Judge *to* insist on the Juror's sitting in the case: *Held,* That nothing had transpired in relation to this Juror, to constitute a good challenge for cause, and that if a good cause and waived, the consent cures the irregularity.

[3.] Where the evidence shows a concert of action between two parties, in relation to a homicide, the Court may, in its discretion, admit the acts and declarations of one accomplice to criminate the other, touching the common object; and such discretion will not be controlled by this Court, except in a case of manifest abuse.

Indictment for murder, in Greene Superior Court. Tried before Judge Johnson, March Term, 1850.

The issue in this cause was on a plea of " not guilty," of the plaintiff in error, to an indictment against plaintiff in error and John D. Malone *alias* Hall, for the murder of one Simeon Fuller.

When the State presented the panel of forty-eight Jurors, and was about to put the same upon the prisoner, the prisoner, by his counsel, challenged the array, on the ground " that John Oliver and twenty-one others of the panel, and who were on the regu- lar panel of Jurors for said term of said Court, were not select- ed and sworn according to law, in this, that they were selected by a majority of the Justices of the Inferior Court, together with the Sheriff and Clerk, and by them sent up to the Judge of the Superior Court, and were by him deposited in the Jury box ; and by the presiding Judge drawn therefrom, and summoned by the Sheriff of said County."

Which motion and challenge was refused by the Court, and defendant excepted.

Bernard Moore, one of the Jurors, being put upon the prisoner, and having answered in the negative the questions propounded under the Code, prisoner, by his counsel, required that he should be placed on trial before triors ; whereupon, two Jurymen, previously sworn in chief, though not sworn as triors, acted as such, and found the Juror competent, who, not being challenged by the prisoner, was sworn in chief. Several other Jurors were placed upon the same triors and found competent, and challenged peremptorily by the prisoner. It being subsequently discovered, that the Jurors had not been sworn as triors, the Court directed the list to be re-called, beginning with the first one tried by the triors ; and as each of those previously tried was called, prisoner challenged them for cause, on the ground that he had previously challenged them peremptorily. The Court allowed the challenge for cause. When Bernard Moore was called, the prisoner objected to his being placed upon him as a Juror, on the ground that he was already sworn in chief. The Court decided, that the Juror should try the cause, "the defendant not objecting at the time, and the Court considering the objection of prisoner as equivalent to insisting upon his acting as a Juror, inasmuch as he had expressed himself 'content' with the Juror, and he had been sworn in chief." To this decision defendant excepted.

The following are some of the material facts proven on the trial :

Simeon Fuller, the deceased, lived in Greene County, and about the 8th June, 1849, suddenly disappeared. John D. Hall was living at his house. Fuller had in his possession several negroes, to which John D. Hall and prisoner claimed title, they being his step-sons.

*James M. Oliver* was at home on the day of the alleged homicide. Lived about 300 yards from Fuller's house. Heard the report of a gun between sunset and dark, in the direction of Fuller's house. Heard some one cry, " Oh ! Lordy," three times immediately after the firing. The next time he saw Fuller, his body was drawn up from Richland creek, about 300 yards from his house. The hands were tied behind him, a chain wound around his waist, and two plow hoes hung thereto. He was shot

under the eye, and the bullet came out at the ear.   There was a severe wound on the head—the skull.being broken.   Saw the tracks of two men going and coming out of the creek at the bank where the body was found.   Witness, on 10th June, saw blood in the horse-lot, on a plank some three feet long, three inches wide and one inch thick.   Saw blood on the draw-bars, which had been shaved with an axe, as if to get the blood off. Saw blood and hair on a rock, also, weighing three or four pounds. There was a storm threatening at the time the gun and cries were heard.   On next day, went to Fuller's house.   Fuller's wagon was standing in the road, nearly loaded with household furniture, &c. horses harnessed, and no one there.   Saw two wounds on the cheek, as if made with a knife.   Horse-lot is a public place.

*James Atkinson* saw Fuller on 8th June, about half hour before sunset, about half mile from his house, in witness' field; deceased said he would see witness next day; heard the gun; called at Fuller's house next morning and asked for him ; saw prisoner and John D. Hall together; saw the wagon loaded that night; provisions cooked and no one there; saw two persons run off from the house ; starlight night; Fuller's hat was in a trunk in the house; there was a light in the house as he approached, but was put out; Fuller's wife, prisoner's mother, died in February, 1849.

*John H. Harris* saw prisoner the day he arrived from the west on the cars; prisoner asked where his brother, John D. Hall, was; prisoner said he had received a letter or two from him respecting property Fuller had; said he came after it; that his brother said Fuller intended to bring a law-suit for it; said before Fuller should have it, he would have to take all his little pile, and "by God he had come after it, and he be d—d if he did not have it or take him one."

*Mrs. Rowland* lives a mile from Fuller's; prisoner and John D. Hall came to her house on 8th June and asked for powder; she objected, and they insisted on two or three loads; prisoner pouring it out, and saying his brother wanted to try his pistol.

*Wm. Atkinson* saw deceased about one hour before sun down on 8th June; saw prisoner and John D. Hall coming up from the creek on 9th June, between one and two o'clock, p. m.

*George Warren* was at Fuller's house on afternoon of June 8; asked what was to be done about the property; prisoner said he

had made a proposition to Fuller, which he had refused, and that he would stay there until Christmas or Christmas year, but what he would settle in some way or other; prisoner and John D. Hall were there together.

*Catharine Thomas* heard prisoner swear he would kill Fuller before he should have one cent of the property.

*William Walker*, on 10th June, saw tracks of four persons going off from Fuller's; they seemed to stop under a peach tree; thence they went into an old field, where he could trace them no longer; confirmed the testimony of other witnesses on several points.

*A. Hutchinson* was one of the neighbors who went to Fuller's house on the night of the 9th June; confirmed the testimony as to wagon, the lights, the running away of the persons from the house; *Abram*, one of the negroes, disappeared.

*James King* was there also; heard two voices at the wagon, and thought one was prisoner's; the things at the house were very much scattered; a trunk in the wagon was broken open, and had Fuller's hat, tumblers, spoons and clothing in it; there was a black wool hat in a bag, which appeared to be wet, as if it had been washed.

*Thomas Atkinson.* Fuller had on a black wool hat, 8th June, about sunset, in his own field; heard the gun.

*John Zachery* was at Fuller's 9th June; heard the voice and believed it to be prisoner's.

*Samuel Tomlin.* Prisoner came to his house in Newton County, on evening of 10th June, with John D. Hall and the negro Abram, all on foot, and insisted on staying all night; said they had missed the cars at Buckhead, and had been walking all day; said it looked bad to see a man walking and having a negro; said his brother had a negro girl given to him and he persuaded him to swap the girl for this boy; they stayed all night and left about daylight.

*Lewis Zachery* saw prisoner 11th June; heard of the murder, and the rumor that the murderers were in Newton County; went to the depot to watch; saw two white men and a negro above the platform on the track; he intercepted them in a deep cut; said, " gentlemen, murderers, you can go no farther;" prisoner and John D. Hall sunk on their knees; prisoner ran off; John D. Hall tried to run, and witness knocked him down; wit-

ness caught the negro, but John D. Hall ran off; both were afterwards caught; prisoner said, " as for killing Fuller, he knew nothing about it, and he must have been killed by negroes, if killed at all."

*A. M. Ramsey.* Prisoner had a pistol, powder-flask and knife when arrested.

*Peter Clark* met prisoner the day he arrived from the west; prisoner asked where his brother John was, and what the people said about the property at Fuller's; witness replied he expected there would be a law-suit; prisoner said, I shall stand no law-suit, and among other things, slapped his hands on his pocket and said he had there what would get the property; prisoner had a pair of saddle-bags; witness was at Fuller's on 9th June, and saw the saddle-bags with the weights off the clock in them.

*James Atkinson,* recalled. At the time he saw prisoner and John D. Hall together at Fuller's on the morning of 9th June, inquired for Fuller; prisoner went off towards the house and walked to and from the passage, when John D. Hall said Fuller had gone up the country to Mr. Malone's; witness asked what time he started; Hall paused and answered, yesterday evening; prisoner was about fifteen steps off, and he thinks might have heard what was said; prisoner said nothing.

Defendant's counsel objected to the sayings of John D. Hall; which objection the Court overruled, on the ground that the evidence already produced had established the fact of a joint action and intention, sufficient to authorize the admission of the testimony. To which decision defendant excepted.

Similar evidence was offered to be proven by *William Atkinson,* and the same objection made; which being overruled, defendant excepted.

On which several exceptions error was assigned.

CONE, for plaintiff in error.

Sol. Gen. BARTLETT and N. G. FOSTER, for defendant in error.

*By the Court.*—LUMPKIN, J. delivering the opinion.

This is a writ of error to Greene Superior Court, upon an indictment for murder, against William H. Malone, otherwise call-

ed William H. Hall.   The cause came on for trial at the March Term, 1850, of the Superior Court of said County, His Honor HERSCHEL V. JOHNSON, presiding.

We propose to consider the questions made in the record, in the order in which they are presented in the bill of exceptions.

[1.] When the State presented to the prisoner a panel of forty-eight Jurors, he challenged the array, on the ground that they had not been chosen and sworn according to law, in this, that they were selected by a majority of the Justices of the Inferior Court, together with the Clerk and Sheriff of the County, and by them sent up to the Judge of the Superior Court; whereas, the said Jurors should have been selected, by the Clerk, in the presence and under the immediate direction of the Judge of the Superior Court.

The sum of this objection is, that the forty-eight Petit Jurors were chosen under the Act of 1805, (*Prince*, 443,) instead of the Act of 1797, ( *Watkins*, 627,) as they should have been.

By reference to these Acts, it will be seen that *Petit* Jurors are not *selected* at all, under either of them.   Under both, the Clerk of the Superior Court is directed to procure from the tax book, a list of all persons liable to serve as Jurors, according to the qualifications therein prescribed, (which, by the way, are precisely the same under both Acts;) and this is a mere mechanical duty to be performed by that officer, and one which involves no discretion whatever.   From this list, by the Act of 1797, the Clerk, under the direction of the Judge of the Superior Court, is to select the *Grand Jury ;* and from the same list, under the Act of 1805, the *Grand Jury* is to be selected by the Justices of the Inferior Court, or a majority of them, together with the Clerk and the Sheriff.

The change, therefore, is only as to the mode of selecting the *Grand Jury*, and the persons remaining on the list, under both Acts, are to be *Petit Jurors* for the trial of all civil and criminal causes; and under both, persons returned as Jurors, who are not qualified to serve, are to be discharged on challenge and proof by either party, or on the Juror's own oath as to his incompetency.

Mr. *Prince* is right, therefore, in assuming that the mode of selecting Jurors under the Act of 1797, is superseded by the 57th section of the Act of 1805 ; and the uniform practice of the Su-

perior Courts throughout the State, for near fifty years, is justified by a proper construction of these Statutes; and our judgment is, that the objection taken to the decision below, overruling the motion to quash the array because the Jurors were improperly drawn and sworn, has nothing in it.

[2.] The panel was then put upon the prisoner, and Joseph Nelson and Abner B. Ely, having been sworn as Jurors in chief, Bernard Moore being called, and having shown himself competent, by answering negatively the questions propounded to him under the Act of 1843, he was, at the request of counsel for the accused, put upon triors, and the two Jurymen aforesaid were appointed for that purpose, who, without having been sworn as triors, returned a verdict that Moore was competent. The prisoner announced that he was content with Mr. Moore, and he was sworn in chief. Several other Jurors were also passed upon by said triors, each of whom was found ·to be competent, and challenged peremptorily by the defendant.

It being subsequently discovered that the two Jurors who had acted as triors, were not specially sworn as such, the Court directed the list to be again called, commencing with the names of those who had been passed upon by the triors ; and the prisoner objected to each, upon the ground that they had already been put upon him and peremptorily challenged ; which objection was allowed by the Court, and the Jurors were set aside for cause, and not counted against the prisoner.

When the name of Bernard Moore was called, he was put upon the prisoner and objected to, on the ground *that he was sworn already in chief as a Juror to try the prisoner.* The Court sustained the objection, and decided that Moore should be of the Jury to try the cause. The prisoner, by his counsel, excepted to this opinion.

We have bestowed much consideration on this portion of the record. The ground of challenge to Moore was, that he had already been sworn in chief, and the presiding Judge certifies that he understood the objection as tantamount to insisting that he should serve as a Juror.

If this explanation of the proceeding be correct, and it seems to me to be the only reasonable one that can be given, no injustice has been done. *Consensus tollit errorem,* (2 *Just.* 123,) viz : the acquiescence of a party who might take advantage of an error

obviates its effect.   Still, if upon an examination of this record, we had found it did not justify the construction put upon it by Judge *Johnson*, and that by reason of this misunderstanding, the prisoner had been deprived of some legal right, we should have felt constrained to remand the cause.   Such, however, in our judgment, is not the fact.   It is now contended in the argument, that this was a challenge for cause, and that being allowed, the Juror should have been set aside, as a matter of course; but nothing had transpired as to Bernard Moore, which would, in the least, affect his competency.   He had, when interrogated, not only stated on oath, that he had formed and expressed no opinion in regard to the guilt or innocence of the prisoner, and that he had no bias or prejudice resting on his mind for or against him; but he was put upon triors and pronounced indifferent by them, and having passed through this ordeal, the prisoner professed himself satisfied, and he was sworn well and truly to try the issue between the people and the prisoner.   What, I ask, was there in all this, to make him objectionable for cause?   Nothing.   As to the other Jurors who had been found competent and then peremptorily challenged, it might be supposed that their capricious rejection by the accused had excited some ill-will in their minds towards him, and hence the Court very properly, perhaps, permitted them to be set aside, without charging them to the prisoner as peremptory challenges.   But the very reverse of this was true as to Moore.   His acceptance was calculated to conciliate him toward the prisoner.

It will be observed, too, that there is no complaint by the prisoner, that Moore was forced upon him, notwithstanding he objected to him on account of the irregular manner in which his competency was ascertained.   Had this been done at the time, as the trial progressed, or afterwards, upon a motion for a new trial, the result might have been different.   It was competent for the prisoner to have accepted the Juror before he was put upon triors, and equally so after he was passed upon by the triors; and this he did, as is shown by the record.   The objection, therefore, comes too late, and while it is specious and ingenious, the facts in the record, unfortunately, do not support it.   Taking any view, therefore, of this exception, the Court is of opinion that there is no error.

[3.]  We come now to the last error assigned.   The prisoner,

by his counsel, objected to the *sayings* of John D. Hall, the brother of the accused, as testified to by the Atkinsons, James and William, but was overruled by the Court, for the *reason that* the evidence previously adduced, had sufficiently established a common purpose in the perpetration of the felony, to authorize the admission of this proof.

We will not recapitulate the evidence. It is exceedingly questionable whether the sayings of John D. Hall were not heard by William. The probability is that they were. He was certainly in a position where he might have heard them. These sayings could have had but little influence, if any, on the minds of the Jury; their object being merely to put inquirers upon a false scent as to the whereabouts of the deceased; but, in our opinion, the facts which were in proof, fully warranted the introduction of these sayings; for, whatever doubt might exist as to a privity of *intention, a community of action* was most palpably proven.

But the counsel for the prisoner insists, that admitting the evidence to have established a common purpose between these parties, that still it is the *acts* only, and not the *sayings* of the accomplice, which can affect the accused. But we apprehend the law to be otherwise; and the rule upon this subject, to be correct, as thus briefly stated by Ch. J. *Tilghman*, in *The Commonwealth vs. Glerle and others*, (8 *S. & R.* 9)—"You cannot," says he, "affect one man by the speeches of another, until you have proved that they were engaged in a common enterprise; that being proved, the *words* of one are evidence against the other, but not conclusive."

Mr. *Roscoe*, in his *Treatise on Criminal Evidence*, maintains the same doctrine. After stating that where several persons are proved to have combined together, for the same illegal purpose, any *act* done by one in reference to the common object, is, in contemplation of law, as well as in sound reason, the act of all, he adds, that *verbal declarations* are equally admissible, and that *declarations* made by one of the party in pursuance of the common object, are evidence against the rest, who are as much responsible for all that is *said* and *done* by their associates, in carrying into effect the concerted plan, as if it had been pronounced by their own voice, or executed by their own hand. *Roscoe on Crim. Ev.* 80.

The Court, therefore, is unanimously of the opinion, and such is their judgment, that there is no foundation for this writ of error.

It only remains to say, that we leave this unhappy man to the awful doom which awaits him. A fitter sacrifice, perhaps, has rarely been offered up on the altar of criminal justice. May he find that mercy which he so relentlessly denied to his helpless and bleeding victim !